Filed 9/17/14  P. v. Boyle CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063326 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN297101) |
| STEPHEN BOYLE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E. Mills, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found Stephen Boyle guilty of three counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)(A))[1] (counts 1, 2, and 5), assault with intent to commit a specific felony (§ 220, subd. (a)(l)) (count 3), and rape by foreign object with force (§ 289, subd. (a)(l)(A)) (count 4) against victim Rachel O. (Rachel). The jury also found Boyle guilty of forcible rape (§ 261, subd. (a)(2)) (count 3) against victim Ashley H. (Ashley).

In addition, the jury found true a number of allegations brought pursuant to the One Strike law (§ 667.61). As to Rachel, the jury found that Boyle: committed a kidnapping and that the movement of the victim substantially increased her risk of harm (§ 667.61, subd. (d)(2)) (counts 1, 2, 4, and 5); was convicted in the present case of raping another victim (§ 667.61, subds. (b), (c), (e)) (counts 1, 2, 4 and 5); and personally used a dangerous and deadly weapon (§ 667.61, subds. (b), (c), (e)) (count 2). As to Ashley, the jury found that Boyle committed the rape during the commission of a burglary with the intent to commit forcible rape (§ 667.61, subds. (a), (c), (d)), and that

---

[1]    Unless otherwise specified, all subsequent statutory references are to the Penal Code.

he was convicted in the present case of raping another victim (§ 667.61, subds. (b), (c), (e)) (count 6).[2]

In a bifurcated proceeding, the court found that Boyle had previously suffered one serious felony prior (§§ 667, subd. (a)(l), 668, 1192.7, subd. (c)) and one strike prior (§§ 667, subds. (b)-(i), 668, 1170.12)).

The trial court sentenced Boyle to an aggregate term of 263 years to life in prison.

On appeal, Boyle claims that the trial court violated his right to due process by refusing to grant either a mistrial or a new trial as a remedy for the prosecutor's alleged *Brady*[3] violation. Boyle also claims that the trial court abused its discretion in denying his motion to sever the trial of count 6, which charged the offense involving Ashley, from the trial of the remaining counts, which charged the offenses committed against Rachel, and violated his right to a fair trial by conducting a joint trial. We affirm the judgment.

---

[2] In addition to the One Strike law allegations, the jury also found that Boyle used a deadly weapon in the rape of Rachel, within the meaning of section 12022.3, subdivision (a) (count 2).

[3] (*Brady v. Maryland* (1963) 373 U.S. 83.)

FACTUAL BACKGROUND

A.    *The People's evidence*

1.    *Boyle's rape of Ashley* (*count 6*)

In October 2008, Ashley lived next door to Greg Hall, the former president of a motorcycle club called the Gun Fighters.  Ashley was friends with Hall and attended a Gun Fighters' Halloween party at his residence.  Boyle, who had met Ashley on several previous occasions, attended the party as well.  At that time, Boyle was a prospective member of the Gun Fighters.  Boyle and Ashley flirted with each other during the party, and, at one point, Boyle kissed Ashley.  Shortly thereafter, someone at the party told Ashley that Boyle was married.  After learning Boyle's marital status, Ashley was no longer interested in him and stayed away from Boyle throughout the remainder of the party.

After leaving the party, Ashley went next door to her residence, went into her bedroom, locked her bedroom door, put on some pajamas, and went to sleep.[4]  After falling asleep, Ashley heard a knock on her bedroom door.  She then heard Boyle asking her to open the door.  Ashley ignored the knock, thinking that he would go away.  About 20 minutes later, Boyle knocked again, and this time asked her in a louder voice to open

---

[4]    Ashley explained that she locked her bedroom door because she and her roommates had an " 'open door policy' " and many people were going back and forth between the party at Hall's residence and her residence.

her door.  Ashley opened the door and Boyle walked into her bedroom.  Ashley told Boyle that she was going to bed, but Boyle took another step inside the room, forcefully pushed Ashley against the wall, closed the door and locked it.

Boyle picked up Ashley by her armpits and threw her onto the bed.  Boyle then pulled off Ashley's pajama pants, put his arm across her chest, and held her shoulder down.  Boyle proceeded to rape Ashley for approximately two to five minutes.  After the rape, Boyle told Ashley not to tell anyone, and added that he was "not somebody to be reckoned with," and that "his brothers would have his back."  These threats frightened Ashley, particularly because she knew that Boyle had a criminal history.

2.      *Boyle's rape of Luz P. (propensity evidence)*

On the evening of May 22, 2010, Luz P. (Luz) and some friends went to a bar in Tombstone, Arizona.  Boyle, who was also at the bar, met Luz, and the two danced.  At approximately 9:00 p.m., Luz and her friends left and went to a second bar.  Boyle met up with Luz at the second bar and again began talking with Luz and one of her friends.  At approximately 1:00 a.m., Luz and her friends decided to leave the second bar.

While Luz's friends were paying their bill, Boyle asked Luz to come outside with him to look at his motorcycle.  Luz agreed.  As soon as Boyle and Luz were outside the bar, Boyle forcefully grabbed Luz's hand and led her away from the bar.  Boyle forced

5

Luz to walk with him to a dark and solitary area, telling her, "Shut up bitch. Keep walking."[5]

Boyle eventually stopped walking and yelled, "Bitch, pull your pants down." Boyle then forced Luz to take her pants down. Boyle got on top of Luz and held her down. While Boyle was on top of Luz, her cellular phone fell. Boyle grabbed the phone and threw it into a nearby trash can. As Boyle attacked Luz, she begged him to stop and told him "no" several times. Luz thought that Boyle might kill her. Boyle forced Luz to orally copulate him and raped her.

3.    *Boyle's sexual assault of Rachel (counts 1-5)*

Rachel, her husband, Kevin, and another couple that they were friendly with, attended an overnight camping party held by the Grifters Motorcycle Club[6] in a remote area of Warner Springs on Saturday, September 24, 2011. Rachel and Kevin had been socializing with the Grifters for a couple of months before the party because Kevin was considering joining the club. Rachel had met Boyle on approximately two occasions prior to the party. At the time of the party, Boyle was president of the South County chapter of the Grifters.

During the party, Boyle told Rachel that he needed to talk with her about something. Rachel thought that Boyle wanted to talk about Kevin. Boyle led Rachel

---

[5]    Boyle weighed about 240 to 260 pounds. Luz was four feet nine inches, weighed 100 pounds, and had a prosthetic leg.

[6]    The Grifters were formerly known as the Gun Fighters.

away from the main party to an area where a number of motorcycles were parked. Boyle began showing Rachel his motorcycle. Boyle told Rachel that the seat on his motorcycle was comfortable, tapped the seat, and told her to "test it out." Rachel got on the seat. Boyle then got on the motorcycle and drove off with Rachel on the back of the motorcycle. They had never discussed leaving the party and Rachel did not want to go anywhere with Boyle.

As Boyle rode off, Rachel yelled at him to take her back to the party and hit him in the back with both of her hands. At one point during the ride, Boyle reached around and tried to put his hand down Rachel's tights. Boyle pulled off onto a remote gravel road and angrily told Rachel to get off of the motorcycle. Boyle put his hand around Rachel's neck and shoulder and forcefully pushed her over the motorcycle so that her stomach was on the seat. Boyle orally copulated Rachel despite her pleas to stop. Boyle tried to penetrate Rachel's vagina with his penis while she was bent over the motorcycle, but he was unable to do so because he was not sufficiently erect.

Boyle pushed Rachel to the ground hard and told her to "start sucking," which she refused to do. Boyle became angry and pulled out a knife that was approximately six inches long. Boyle told Rachel, "[I]f [you] [don't] start sucking . . . [this will] be the last dick [you] ever sucked" and started to rub the knife around Rachel's throat, face and hair. Rachel complied and orally copulated Boyle.

At one point during the encounter, an eyewitness, Kenneth Russell, drove by Rachel and Boyle. Russell saw Rachel orally copulating Boyle, but did not see a knife in

7

Boyle's hands. Russell estimated that he saw Rachel and Boyle for approximately five seconds, before driving off quickly when Boyle gave him a dirty look.

At some point during the oral copulation, Rachel stopped, but Boyle forced her to continue. At another point, Boyle forced Rachel to the ground and stuck his finger in her rectum. Rachel started to scream, which made Boyle angry. Boyle told Rachel to get up and "finish it." Rachel orally copulated Boyle again and he ejaculated in her mouth. Semen got on Rachel's face, tights, and hands.

After the assaults, Boyle told Rachel to get back on the motorcycle. Boyle told her that if anyone asked where they had gone, she should say that they just went for a ride to a lake. Boyle then drove the two back to the party. Immediately upon their return, Rachel disclosed the assaults to a friend, who drove her to the hospital and called 911. On the drive to the hospital, Rachel vomited and had a seizure.[7] At the hospital, Rachel learned that she had vaginal bleeding and that there was gravel embedded in her arms.

In an office next to the hospital, Rachel underwent a sexual assault response team (SART) examination. Rachel had dirt on her hands and face, scratches on her arm, and redness around her cervix and anal opening. In addition, Boyle's sperm was found in an oral swab taken from Rachel. Boyle's DNA was also found in an external genital swab taken from Rachel. Boyle's semen was found on Rachel's hands, face, and on her tights.

---

[7] Rachel suffers from epilepsy.

In the hours after the assaults, law enforcement officers attempted to locate Boyle, but were unable to find him. Two days later, Boyle was arrested near the border between the United States and Mexico.

B. *The defense*

Angela Miller used to date one of the Gun Fighters and attended their 2008 Halloween party. Miller stated that she saw Ashley after Boyle had left the Halloween party and that Ashley did not seem upset nor did she appear to have been crying. Miller also saw Ashley hug Boyle at social gatherings that occurred after the Halloween party.

Ronald Hayes was one of Ashley's roommates in October 2008. Hayes remembered parts of the evening of the Halloween party, but he was drunk that night and was also on drugs. Hayes did not hear Ashley call out for help, and would have assisted her if he had heard her calling for help.

Andrew Ritz saw Boyle and Luz walking together after the alleged rape in May 2010. Boyle and Luz were holding hands and laughing.

### III.

### DISCUSSION

A. *The trial court did not err in refusing to grant either a mistrial or a new trial as a remedy for the prosecutor's alleged* Brady *violation*

Boyle contends that the trial court violated his right to due process by refusing to grant either a mistrial or a new trial as a remedy for the prosecutor's alleged *Brady* violation.

9

1. *Factual and procedural background*

    a. *The trial court tentatively denies Boyle's motion for a mistrial*

Near the end of the trial, outside the presence of the jury, defense counsel orally moved for a mistrial based on an alleged discovery violation. Defense counsel explained that the previous day he had received, for the first time, a laboratory report analyzing urine taken from Rachel on the night of the charged offenses, and that the report indicated the presence of hydrocodone. Defense counsel argued that if he had been aware of the report, "[i]t may have changed how I conducted my cross-examination of [Rachel] as well as the other people that were there and what they noticed of her." Defense counsel argued further that he did not believe that Rachel had a prescription for the drug and instead, had been using it "recreation[ally]." Counsel asserted that hydrocodone is a "central nervous system depressant," which "affects one's judgment." Counsel added that blood that was drawn from Rachel at the time of her SART examination had apparently not been tested for the presence of drugs in her system, and explained that he did not, at this point, have sufficient time to have the blood tested and "have an expert come in here and tell us all—whether she was loaded or not."

The court responded, "I think probably both [defense counsel and the prosecutor] were aware that this testing was done but didn't get the results in advance." The court added that it wanted to hear from the prosecutor concerning the reason for the late disclosure and whether Rachel had a prescription for the drug.

The prosecutor explained the reason for the late disclosure as follows:

"Your honor, with regard to the timing of the discovery request, when my paralegal was looking into getting a criminalist early with regard to the blood results, we talked to the on-call criminalist which ended up being Jorge Pena.[8]  And he was the one that informed my paralegal that, by the way, there is a toxicology result.  It never came up on the screen that our office looks at to request results.  And so as a result, we had looked into it after we got word yesterday from Jorge Pena that, yes, indeed there was a urine sample that was taken from Rachel O. and subsequently tested in April of 2012 by the Bio-Tox laboratory."

The following colloquy then occurred:

"The court: And that's the urine sample that we've heard testimony from the SART nurse it was taken by the SART nurse at the time of the SART exam?[9]

"[The prosecutor]: Yeah it would have been one of the samples that the SART nurse took.  And as soon as—

"The court: Wouldn't it have been normal course for it to have been examined?"

"[The prosecutor]: I don't know that answer.  I do know that . . . our office requests test be done to determine whether there are any substances in the victim or patient's system.

---

8      It appears that the prosecutor was referring here to the results of a blood *alcohol* test.  Pena, who is a criminalist with the San Diego County Sheriff's crime laboratory, testified that a blood alcohol test had revealed no alcohol in Rachel's blood.  As discussed in part III.A.1.f., *post*, in his motion for new trial, Boyle presented evidence of a blood test for *narcotics* that revealed the presence of hydrocodone in Rachel's blood.  The blood test for narcotics was not disclosed to the defense at any time during the trial.

9      The SART nurse testified that she took a sample of Rachel's blood and her urine during the examination on the night of the charged offenses.

12

"The court: And isn't it reasonable for me at least to [believe] at this point that once the blood and urine are taken in the SART exam, that they're both going to be tested?

"[The prosecutor]: Yeah, I would think that they would both be tested.

"The court: And the point is, [as] I said earlier, neither of you ever checked on it.

"[The prosecutor]: No, I did not check on the urine portion of it."

"The court: Okay."

The prosecutor then said that she would make available for examination and cross-examination the following day the toxicologist who had performed the laboratory analysis of Rachel's urine. After further discussion between the court and the prosecutor concerning the scope of such testimony, the court stated, "That's a positive step. But, still, the defense doesn't have time or opportunity to find their own expert. [¶] We're not going to grant the motion right now. But I'm not going to deny it right now either . . . ."

After additional discussion among the court and counsel concerning whether Rachel had a prescription for hydrocodone, the prosecutor indicated that Rachel would be available for further examination regarding this issue. The trial court ruled that the toxicologist and Rachel would be subject to examination before the jury the following day. The court indicated that it would refrain from making a final ruling on the motion for a mistral until after the additional testimony was completed.

13

b.       *The People's written opposition to Boyle's oral motion for a mistrial*

The following day, the People filed an opposition to Boyle's motion for a mistrial in which they argued that a mistrial was not warranted, for several reasons.  The People emphasized that Rachel and the toxicologist who had tested her urine, Ola Bawardi, would provide additional testimony concerning the test results.  In addition, the People stated that Rachel would testify that she had been prescribed hydrocodone to alleviate pain from a back injury.  The People also noted that Rachel had disclosed during her SART examination that she had taken hydrocodone, and that the defense had been provided with a recording of the SART examination in October 2011.  Finally, the People indicated that they were not opposed to a "curative instruction regarding discovery should the defense request it."

c.       *Additional testimony pertaining to Rachel's prescription drug usage*

That same day, the court instructed the jury regarding the additional testimony pertaining to Rachel's urinalysis, as follows:

> "During the trial, you heard evidence that Rachel O. had a SART exam[ination].  At the exam[ination], there was a blood sample taken and a urine sample taken.  You've heard evidence about the blood sample.[10]  Well, after Rachel O. testified, the lawyers realized that they did not have or know the results of the urine sample.  And so that's been checked on.
>
> "So now Rachel O. is going to be recalled and you're going to hear some evidence from her, and then from the toxicologist who analyzed the urine sample and what it means.  As with all things in a

---

10      It appears that the trial court was referring to the blood *alcohol* test, since it is undisputed that the jury did not hear any evidence pertaining to a blood test for *narcotics*.

14

trial, it's up to you as jurors to determine how important it is, if it's important at all."

The People then recalled Rachel to the stand and asked her several questions concerning prescription medications that she regularly took. Rachel testified that she took Keppra for her seizures, Vicodin, which is also known as hydrocodone, for pain related to a neck and back injury, Naproxen, which is a muscle relaxer, and Thorazepam for anxiety. Rachel further testified that on the day of the charged offenses, she took all of these medications at 2:00 p.m. Rachel also testified that she told the nurse during the SART examination about each of the medications that she had taken that day.

On cross-examination, Rachel acknowledged that she had previously testified at the trial that she drank two beers on the night of the charged offenses. Rachel also explained that her doctor had prescribed Vicodin for her to use on an as-needed basis. Rachel acknowledged both that her bottle of Vicodin contained a warning against drinking alcohol while using the drug, and that she was not "supposed to drink heavily" when taking her prescription medications. Rachel also testified that she generally takes approximately four or five Vicodin pills a week.

On redirect examination, Rachel agreed with the prosecutor that she "[knew] what was going on" on the night of the charged offenses, and that the combination of prescription medications and alcohol that she had consumed that night did not make it difficult for her to recall what had occurred.

15

Bawardi testified that she performed an analysis of Rachel's urine and determined that it contained 142 nanograms per milliliter of hydrocodone. Bawardi explained that this amount suggested that Rachel had taken the drug within 24 hours prior to the sample draw, but added that it was difficult to determine the significance of the amount of hydrocodone in a person's urine because "the drug levels or drug concentrations in urine can fluctuate based on how hydrated a person is." Bawardi also testified that hydrocodone is a central nervous system depressant and that "the effects of hydrocodone can be similar to the effects of alcohol," in that they are both depressants.

On cross-examination, Bawardi agreed with defense counsel that the use of alcohol with hydrocodone can have an "additive effect." In addition, Bawardi testified that typical warnings for the use of hydrocodone caution against using the drug while consuming alcohol or other depressants. Bawardi further suggested that some anti-anxiety medications may be classified as depressants and agreed with defense counsel that muscle relaxants typically are depressants. In addition, Bawardi agreed with defense counsel that Keppra is "contraindicated with regard to consuming alcohol."

Bawardi acknowledged that it was difficult to determine the level of impairment that a narcotic might have on an individual based on a urine test, and that a blood test would provide much more precise information with respect to this issue.

Defense counsel asked Bawardi, "Were you aware . . . that there was also a blood sample taken at the same time as the urine sample that you tested?" Bawardi responded, "No. We must not have received the blood sample. We test what we're given and that's

16

it."[11] Bawardi also testified that it was possible to analyze a subject's blood for muscle relaxers and anti-anxiety medications, but explained that she had not been provided with a blood sample, and that she had not been asked to test for the presence of Naproxan or Thorazepam in Rachel's blood.[12]

      d.     *The trial court formally denies Boyle's motion for a mistrial*

After Bawardi's testimony, outside the presence of the jury, the trial court informed counsel that it did not intend to give a standard CALCRIM jury instruction (CALCRIM No. 306)[13] concerning the failure to timely disclose evidence because, in the court's view, the prosecutor had not committed a discovery violation. The court reasoned:

---

[11]    As discussed in part III.A.1.f., *post*, in his motion for new trial, Boyle presented evidence that Bawardi had in fact analyzed Rachel's blood for narcotics in April 2012, at the same time that she had performed the urinalysis.

[12]    As noted in footnote 8, *ante*, Pena testified concerning a test for *alcohol* that the San Diego County Sheriff's crime laboratory performed on Rachel's blood.

[13]    CALCRIM No. 306 provides in relevant part:

> "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.
>
> "An attorney for the (People []) failed to disclose: <*describe evidence that was not disclosed*> [within the legal time period].
>
> "In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

17

"Each side had the same information about the SART interview. The urine sample being taken. The blood sample being taken, and the blood sample being tested.[14] I don't know what information any of you had about the urine sample being analyzed. . . . But you both knew it had been taken and nobody inquired about it. So I don't think there's any discovery violation."

Notwithstanding the trial court's view that the prosecutor had not committed a discovery violation, the court stated that the late discovery of the report did raise concerns, explaining:

"[M]ost importantly, [the] defense could have called an expert witness on the issue of how these drugs separate[ly] or in combination could have affected the victim, Rachel O.'s perception, her memory and perhaps other issues. That would have been a possibility. [¶] I don't believe that any expert testimony would have made any difference in the trial, because I have a pretty good idea what the expert would have testified to."

Later that day, outside the presence of the jury, the court stated that it was formally denying the motion for a mistrial.

Shortly thereafter, defense counsel stated that it was his intention to draft a jury instruction pertaining to the late discovery of the report. Counsel explained that, although the prosecutor had been very cooperative with respect to discovery issues, "somewhere the prosecution's team faltered."

The court responded by stating in part:

"I don't think if you had it all and you did everything and called expert witnesses, it would make any difference in the case. Because I can't imagine expert testimony that could alter the jury's perception of what occurred. Because the expert would not be able to testify to

---

14    It appears that the court was referring here to the blood alcohol test.

any substantial impairment.  That doesn't mean the jury wouldn't buy an argument that the expert would make.  So that's my weakness in my own reasoning.  I can't say that you couldn't sell it.  But I can say, I feel strongly it wouldn't be very important 99 percent of the time.  But you draft something and I'll look at it.  If I can give it, I will give it.  If I can, I will do it."

e.    *The jury instruction*

Defense counsel requested that the trial court provide the jury with the following instruction:

"The defense was not provided the laboratory report indicating a positive test for Hydrocodone until after the testimony of Rachel O. in this trial.  [¶]  In evaluating the weight and significance of this evidence, you may consider the effect if any, on [*sic*] that late disclosure."

The trial court refused to provide the instruction that the defense requested, but stated that it would give an alternative instruction concerning the issue.  The court then reviewed the language of the court's proposed instruction with both counsel.  During the discussion, the court stated that it was willing to omit language in the proposed instruction to the effect that "the defense did not inquire about" the laboratory report.  Defense counsel requested that the court omit that language.

During final jury instructions, the court instructed the jury as follows:

"[T]he prosecution and the defense did not learn about the results of the urine test that showed a positive test for hydrocodone until after Rachel O.'s original testimony in this trial.  In your evaluation of the significance of this evidence, if any, you may consider the effect of the late discovery of the information."

19

## f.    *The motion for new trial*

After the jury rendered its verdicts, Boyle filed a motion for new trial.  In his motion, Boyle noted that the defense had not received the results of the urinalysis showing the presence of hydrocodone in Rachel's urine until near the end of the trial. Boyle noted further that after the verdicts were returned, he received the results of two tests that had been performed on Rachel's blood that indicated the presence of hydrocodone, carisoprodol and meprobamate.  In explaining the nature of these drugs, Boyle stated, "In other words, [Rachel] had the pain reliever Vicodin, a muscle relaxer and anxiety medication [in her bloodstream]."

Boyle contended that the blood tests supported the granting of a new trial, arguing:

> "Candidly a couple of beers and prescribed anti-seizure medication standing alone would not likely prompt the defense to hire an expert in pharmacology to testify.  Moreover, even the addition of a prescribed therapeutically advised amount of [Vicodin][15]would have been something most likely just dealt with through examination of the witness.  However, even a five minute perusal of the Internet makes it quite clear that all these medications on board at the same time is not only dangerous and addictive, but would dramatically affect judgment, personality, perception, conduct, and more. Certainly this evidence would be best presented and explained by a medical professional: an expert.  [¶]  The bottom line is that Mr. Boyle was denied the opportunity of presenting an expert in pharmacology to help provide an alternate explanation as to Rachel's conduct; to aid in her impeachment; and to present his defense . . . through no fault of his own."

---

15    Although Boyle referred to Valium in his motion, it is clear that he intended to refer to Vicodin, which contains hydrocodone.  There was no evidence that Rachel had Valium in her blood stream.

20

Boyle supported his motion with copies of an April 25, 2012 Bio-Tox Laboratories report revealing the presence of 142 nanograms per milliliter of hydrocodone in Rachel's urine. In addition, Boyle lodged an April 25, 2012 report of blood test from the same laboratory stating that Rachel had 5 nanograms per milliliter of hydrocodone in her blood. Boyle also lodged a November 20, 2012 report from the same laboratory revealing that Rachel's blood contained 1.4 milligrams per liter of carisoprodol and 5.4 milligrams per liter of meprobamate.

The People filed an opposition in which they argued that a new trial was not warranted, for several reasons. The People maintained that the defense had been on notice of Rachel's prescription medication usage from the very beginning of the case, and could have discovered the proffered evidence with reasonable diligence. The People also argued that the results of the blood tests were not material because they did not impeach Rachel, since she had acknowledged at trial that she had taken the prescription medications that were revealed by the blood tests, and the evidence was merely cumulative of the urine results that were presented at trial. The People also argued that any harm caused by the late discovery was cured by the fact that the defense had been given the opportunity to cross-examine both Rachel and Bawardi regarding the medications, and the jury was provided a curative instruction concerning the late discovery. Finally, the People argued, "[I]f the jury was privy to the blood results of Rachel O. indicating a low level of medications in her system, there would be no different result on a retrial of this case."

21

After hearing oral argument from both counsel, the trial court denied the motion for new trial. In denying the motion, the trial court stated that it had considered whether earlier disclosure of the blood test results "could possibly have made a difference in the outcome of the trial," and noted that Boyle had not filed an "expert declaration . . . with the motion saying what the [presence of] the drugs [in Rachel's system] would mean or what the testimony would have been." The court stated further, "And I expect the reason why there wasn't such a document is that it wouldn't have done any good and no expert would have said it would have made any difference."

In denying the motion, the court reasoned:

> "As to the mistrial or new trial on Counts 1 through 5, the Rachel O. counts, I'm real confident those should not be set aside and no new trial should be granted. And I stated the reason on the toxicology, pharmacology, whatever terms we want to use. I've been doing this for an awfully long time, and I just can't see how that would have made any difference at all. . . . I'm very confident it would not have."

2.      *Governing law and standard of review*

In *People v. Williams* (2013) 58 Cal.4th 197, 255-256 (*Williams*), the California Supreme Court outlined the law governing *Brady* claims:

> " 'Under the federal Constitution's due process clause, as interpreted by the high court in *Brady [v. Maryland],* the prosecution has a duty to disclose to a criminal defendant evidence that is " 'both favorable to the defendant and material on either guilt or punishment.' " [Citations]. The prosecution's withholding of favorable and material evidence violates due process "irrespective of the good faith or bad faith of the prosecution." [Citation.]' [Citation.] 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.' [Citation.]

22

'[The] touchstone of materiality is a "reasonable probability" of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." ' [Citation.] In determining whether evidence is material under this standard, we consider ' "the effect of the nondisclosure on defense investigations and trial strategies." ' [Citation.]"

The California Supreme Court has summarized this law by stating, " 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176 (*Letner and Tobin*).)

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*Letner and Tobin, supra*, 50 Cal.4th at p. 176.)

3.    *Application*

The People do not dispute that the evidence at issue, the results of a urine test and a blood test demonstrating the presence of narcotics in Rachel's system, was favorable to Boyle. Further, we assume for purposes of this decision that the People suppressed this

23

evidence.[16]  However, we think it is clear that the evidence at issue was not material under *Brady*, in that there is not a " ' "reasonable probability" ' of a different result" (*Williams*, *supra*, 58 Cal.4th at p. 256), if the urine test and blood test had been disclosed earlier.

Most importantly, there is nothing in the record to suggest that the evidence of Rachel's use of any of the prescription drugs at issue rendered her testimony that she was subjected to a series of forcible sex offenses at knifepoint unreliable.  More specifically, given the nature of Rachel's testimony (i.e. that Boyle took her to a remote location against her will, put a knife to her head, repeatedly shoved her, and forced her to orally copulate him), we see no likelihood that the jury would have evaluated Rachel's testimony differently if Boyle had been able to present additional evidence concerning the manner by which Rachel's use of prescription drugs could have affected her conduct or perceptions on the night in question, or her ability to recall the events of that night. This is particularly true since Boyle *was* able to present the results of the urine test to the jury, and subjected both Rachel and Bawardi to cross-examination concerning the results of the urine test.  (See pt. III.A.1.c., *ante*.)

---

[16]     In their brief, the People focus almost entirely on the April 2012 urinalysis report and fail to address the failure to disclose the April 2012 blood test for narcotics.  Further, the People state, "The results of the blood test were provided to defense counsel in advance of trial."  However, at best, the record citations that the People provide in support of this assertion demonstrate that a blood *alcohol* test was provided to defense counsel.  There is no evidence that the People provided the defense with the April 2012 blood test for *narcotics* at any point during the trial, and Bawardi incorrectly testified at trial that *no* blood test for narcotics had been performed.

Stated differently, Boyle's guilt did not depend on the jury's evaluation of whether Rachel was accurately perceiving and recalling subtle details of the night in question. Rather, in order for there to have been a more favorable result for Boyle, the jury would have had to find that Rachel was lying when she testified that Boyle committed a series of forcible sex offenses against her at knifepoint.[17] Earlier disclosure of the urine and blood tests would not have supported a defense that Rachel was lying, since Rachel testified at trial concerning her use of the prescription drugs at issue and told the SART examiner about her use of these drugs on the night of the charged offenses.

Moreover, there was strong evidence of Boyle's guilt that would not have been impeached in any manner by the urine or blood test results, including testimony concerning Boyle's aggressive behavior and his angry display of a knife during the afternoon of the charged offenses, physical and eyewitness evidence demonstrating sexual contact between Boyle and Rachel, Rachel's injuries, Rachel's immediate disclosure of the offenses, propensity evidence of Boyle's commission of other sex offenses, and Boyle's flight and arrest at the international border. In sum, there is nothing about the People's assumed suppression of the urine and blood tests in this case that " ' "undermines confidence in the outcome of the trial" ' " (*Williams*, *supra*, 58 Cal.4th at p. 256), even after considering the effect of such assumed suppression on " ' "defense investigations and trial strategies." ' " (*Ibid.*)

_____

[17]    There is nothing in the record that suggests that any of the prescription drugs could have produced a hallucinogenic effect.

Boyle's arguments to the contrary are not persuasive. Boyle maintains that he was "unable to present forensic expert witness testimony demonstrating the effect of these powerful prescription medications in combination with each other and combined with alcohol." However, as the trial court noted in denying Boyle's motion for new trial, Boyle could have supplied an expert declaration describing the effects of the drugs in support of his motion for a new trial, but did not do so. Similarly, while Boyle argues that there was "no opportunity for appellant to present evidence as to what . . . [Rachel's use of prescription drugs] would mean in terms of her behavior or cognitive abilities," Boyle could have provided such evidence in moving for a new trial. In any event, even assuming that Boyle had provided such evidence to a jury, for the reasons stated above, we see no possibility of a different result. Finally, in his reply brief, Boyle notes that Bawardi acknowledged that if she had obtained Rachel's blood toxicology "she could offer a more detailed and insightful opinion on the effect the drugs may have had on Rachel O." Even assuming that this is so, there is no evidence that any such testimony would have significantly impeached Rachel's testimony, or that it would have had any effect on the jury's evaluation of the independent and strong evidence of Boyle's guilt discussed above.

Accordingly, we conclude that the People did not commit a *Brady* violation because there was not a reasonable probability that the outcome of the trial would have been different if the urine and blood tests had been disclosed earlier. We therefore

26

conclude that the trial court did not err in refusing to grant either a mistrial or a new trial as a remedy for the prosecutor's purported *Brady* violation.[18]

B.     *The trial court did not abuse its discretion in denying Boyle's motion to sever, and did not deny Boyle his right to a fair trial by trying all of the counts together*

Boyle contends that the trial court abused its discretion in denying his motion to sever the trial of count 6 (involving Ashley) from the trial of counts 1 through 5 (involving Rachel).  Boyle further contends that trying all of the counts together violated his right to a fair trial.

1.     *Factual and procedural background*

In September 2011, the People filed the initial complaint in this case, charging Boyle with several sex offenses against Rachel, including forcible rape (§ 261, subd. (a)(2)) (count 1), three counts of forcible oral copulation (§ 288a, subd. (c)(2)(A)) (counts 2, 3, and 5), and rape by foreign object with force (§ 289, subd. (a)(l)(A)) (count 4).  In June 2012, the People filed a complaint in case No. SCN 306847 (SCN 306847),

---

18     Although not raised as a separate claim, Boyle also suggests that the prosecutor committed a statutory discovery violation under section 1054.1, which requires disclosure to the defendant of "[a]ny exculpatory evidence" (*id*., subd. (e)) that "is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies."  (§ 1054.1.)

Even assuming that the prosecutor violated section 1054.1, a violation of the California reciprocal discovery statute is "subject on appeal to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, and thus is a basis for reversal only where it is reasonably probable, by state-law standards, that the omission affected the trial result."  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13.)  For the reasons provided in the text in connection with Boyle's *Brady* claim, we conclude that it is not reasonably probable that any statutory discovery violation affected the trial result.

27

charging Boyle with one count of forcible rape (§ 261, subd (a)(2)) of Ashley. The following month, the trial court held a preliminary hearing in SCN 306847, and held Boyle to answer on the forcible rape charge.

On July 26, the People filed a motion to consolidate SCN 306847 with this case. After a hearing at which defense counsel objected to the consolidation of the two cases, the trial court granted the motion. That same day, the People filed the operative amended consolidated information in this case, charging Boyle with five sex offenses related to victim Rachel—three counts of forcible oral copulation (§ 288a, subd. (c)(2)(A)) (counts 1, 2, and 5), assault with intent to commit a specific felony (§ 220, subd. (a)(l)) (count 3), and rape by foreign object with force (§ 289, subd. (a)(l)(A)) (count 4)—and one sex offense related to victim Ashley—forcible rape (§ 261, subd. (a)(2)) (count 6).

Boyle filed a motion to sever trial of the count involving Ashley (count 6) from the counts involving Rachel (counts 1-5). In his motion, Boyle argued that he would suffer "serious prejudice" from a joint trial because "of the lack of cross-admissibility of evidence compounded by the danger that the jury will cumulate and use the evidence in an impermissible manner (i.e. propensity) in order to find Mr. Boyle guilty of both." With respect to cross-admissibility, Boyle argued that evidence of the counts pertaining to Rachel would not be admissible in a trial on the count pertaining to Ashley under Evidence Code section 1101, subdivision (b).[19] Boyle also argued that the counts

_____

[19] Evidence Code section 1101 provides in relevant part:

involving the two victims should be severed because the evidence pertaining to the alleged rape of Ashley was "substantially weaker than the stronger, more recent case [involving Rachel]."

The People filed an opposition. In their opposition, the People briefly argued that the cross-admissibility of the evidence in both cases supported denial of the motion, stating:

> "Although there are some similarities in the cases involving victims Rachel O. and Ashley H. that would be cross-admissible (i.e. Defendant was first a prospect and eventually became the President of the 'Grifters'; the victims were associated with the club but not members; Defendant threatened victims with physical violence if they did not submit to him), the arguments below primarily focus on the need for judicial economy and the inability of the defense to demonstrate a clear showing of potential prejudice."

The People then argued that there is a legislative preference for joint trials and that case law supported the denial of Boyle's motion. With respect to Boyle's contention that

> "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.
>
> "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

29

severance should be granted on the ground that the People were attempting to join a weak case (involving Ashley) with a stronger one (involving Rachel) the People argued, "the evidence in both cases hinges primarily on the testimony of the victims," and the "anticipated defense as to both victims is consent."

At a hearing on the motion to sever, the court indicated at the outset that its tentative ruling was to deny the motion, stating, "I don't see any reason at all to sever the cases except that it makes it easier to try it from a defense standpoint.  [¶]  It's the same charge.  I recognize that the alleged conduct is somewhat different, but it's really the same big picture."

Defense counsel argued that the evidence in the case involving Rachel included "inflammatory material," such as evidence of Boyle's kidnapping of the victim and his use of a knife during the crime.

The court responded by stating in part:

> "I consider the possibility that it benefits the defense to try the 2008 incident [involving Ashley] with the current incident because it may be so we[a]k that it may show the prosecution is overreaching and that could turn out to be an advantage.  I thought about that anyway. It's certainly a possibility.  But I'm not going to grant the severance. I do think it's not the easiest call I ever made but [I am] not going to grant it."

The prosecutor stated that although the court had already ruled, she wanted to make sure that the record was clear with respect to the People's position.  In addition to arguing that the differences in evidentiary strength of the cases did not warrant severing the cases, the prosecutor argued, "[T]he other sort of practical aspect is if the cases were

30

tried separately we would ask for [Evidence Code section] 1108 [evidence] to come in . . . . I think that the fact [that] they can all be done in one trial is definitely resourceful [*sic*]."

Boyle filed a motion for a new trial. In his motion, Boyle argued that there was a "lack of evidence which would truly support a finding of guilt beyond a reasonable doubt" on count 6. Boyle argued further that there was a "real probability . . . that the jurors found a guilty verdict on count six only after the displeasure of hearing evidence regarding the unrelated case involved in counts one through five."

At a hearing on the motion, the trial court commented that count 6 was not as strong as the other counts, and that if count 6 had been tried separately, "it's likely or very likely or possible that the defense would have called Mr. Boyle to the witness stand."

The court further stated:

> "Let's assume the severance, that I made the correct ruling because I think I did, so I'm talking about something else. I'm talking about whether or not, even though severance was proper [*sic*] at the time, there should be a new trial [on count 6].[20] I'm not saying there should. I'm just saying, as I said a minute ago, that it should be discussed."

The prosecutor then summarized the evidence against Boyle with respect to the offense charged in count 6, and argued that Boyle had received a fair trial on this count. The prosecutor also argued that if there had been a separate trial on count 6, "the People

---

20    The court previously stated with respect to counts 1 through 5, "I'm real confident those should not be set aside and no new trial should be granted."

31

would still be asking for [Evidence Code section] 1108 witnesses to testify in that trial . . . ."

Shortly thereafter the trial court stated:

> "I wouldn't have—I'm not buying that argument because I wouldn't have let the other cases come in.  If Count 6 was the only case, probably I wouldn't have."

After further argument from defense counsel, the court denied the motion, stating:

> "Okay, all right.  Well, we've explored it, and that's about all we can really do.  I think the only issue that concerns me is what I raised, and that is whether or not the defense would have been in a better position to put the defendant on the stand in count 6.  That's the only thing that concerns me based on having sat there for 20 years, and probably how I would have tried a case shouldn't make much difference on how I rule.  So, I think everything's on the table, and I'm going to deny the motion for a new trial on all counts . . . ."

2.    *Governing law and standard of review*

a.    *The law pertaining to joinder and severance*

Section 954 provides the statutory authorization for joinder of criminal charges. That section provides in relevant part:

> "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

Even where criminal charges are properly joined pursuant to section 954, a trial court may exercise its discretion to order separate trials in the interests of justice.  "[A] determination as to whether separation [of the trial of offenses] is required in the interests

32

of justice is assessed for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 188.) "In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*).)

"Denial of a severance may be an abuse of discretion where (1) evidence related to the crimes to be tried jointly would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case; and (4) any one of the charges carries the death penalty. [Citations.] The first criterion is the most significant because if evidence on each of the joined charges would have been admissible in a separate trial on the other, ' " 'any inference of prejudice is dispelled.' " ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 985 (*Cunningham*); accord *Soper, supra,* 45 Cal.4th at p. 775, ["If we determine that evidence underlying properly joined charges would *not* be cross-admissible, we proceed to consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible 'spill-over' effect of the 'other-crimes' evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses' "].)

Finally, "[e]ven if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.)

33

b.      *Law relevant to the issue of cross-admissibility*

Evidence Code section 1108, subdivision (a) provides:

"In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Evidence Code section 352 provides:

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*), the Supreme Court described the factors that a trial court should consider in determining whether to exclude evidence that is otherwise admissible under Evidence Code section 1108, pursuant to Evidence Code section 352:

"[T]rial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, at p. 917.)

3.      *Application*

Boyle asserts that it was "undisputed there was no cross-admissibility of evidence between the two cases." We disagree. In their opposition to Boyle's motion to sever, the

34

People expressly argued that there were "some similarities in the cases involving victims Rachel O. and Ashley H. that would be cross-admissible." In addition, at the hearing on the motion to sever, the prosecutor argued, "[T]he other sort of practical aspect is if the cases were tried separately we would ask for [Evidence Code section] 1108 [evidence] to come in . . . . I think that the fact that they can all be done in one trial is definitely resourceful."

In his motion to sever, Boyle failed to present *any* argument as to the cross-admissibility of the evidence under Evidence Code sections 1108 and 352. Boyle has similarly presented no argument on appeal. Even assuming that Boyle had provided such analysis, any such argument would fail in light of the substantial similarities between the two sets of offenses.[21] (See *Falsetta, supra,* 21 Cal.4th at p. 917 [noting that "the probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses"].) All of the charges involved alleged forcible sex offenses committed against adult women. In addition, both victims associated with members of Boyle's motorcycle club and both sets of offenses were committed during or after a club party. Further, the offenses were not particularly remote in time from each other, having allegedly occurred approximately three years apart. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 992 ["Numerous cases have upheld admission

---

[21] In our analysis of the trial court's ruling on the motion to sever, we base our description of the facts of the offenses as discussed in Boyle's motion to sever and the People's opposition to the motion, because we are required to consider the "the record before the trial court when it made its ruling.' [Citation.]" (*Soper, supra,* 45 Cal.4th at p. 774.)

35

pursuant to Evidence Code section 1108 of prior sexual crimes that occurred decades before the current offenses"].) Moreover, there was little possibility that the presentation of evidence of one set of sexual offenses would be "confusing, misleading, or distracting" to the jury in a trial of the other sexual offense (*Falsetta, supra*, at p. 917), since the offenses at issue involved two sets of entirely discrete events and different victims. Finally, while the offenses against Rachel were arguably more inflammatory than the offense against Ashley in that Boyle was alleged to have used a knife in the assault of Rachel, Ashley alleged that Boyle implicitly threatened her with violence if she were to reveal Boyle's crime to anyone.[22] Because all of the evidence was cross-admissible as to each count, " ' " 'any inference of prejudice [in joining all the counts] is dispelled.' " ' " (*Cunningham, supra,* 25 Cal.4th at p. 985.)

In any event, even if we were to conclude that the evidence pertaining to the two sets of offenses was not cross-admissible, we would still conclude that the trial court did not abuse its discretion in denying the motion to sever. Neither set of charges was particularly more inflammatory than the other, in that both involved forcible sexual assaults against adult women accompanied by threats of violence. Finally, none of the charges involved the death penalty. While we acknowledge that the evidence with

---

[22] While Boyle argues that the trial court "ruled that he would not have allowed any Evidence Code section 1108 evidence in the Ashley H. case [if it had been] tried separately," the trial court's extemporaneous remark that it "probably" would not have admitted such evidence, which the court made without the benefit of briefing at the hearing on the motion for *new trial,* does not demonstrate that the trial court erred in ruling on the motion to sever.

36

respect to the offenses against Rachel was stronger than the evidence involving the offense against Ashley, this factor alone does not demonstrate that the court abused its discretion in denying severance. (See *Soper, supra*, 45 Cal.4th at p. 781 ["A mere imbalance in the evidence . . . will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges"].) This is particularly true when we consider, as we must, that "as a general matter, a single trial of properly joined charges promotes important systemic economies." (*Id.* at p. 782 [cataloguing the benefits of joined charges in promoting judicial economy and requiring reviewing courts to consider such benefits].)

Accordingly, we conclude that the trial court did not abuse its discretion in denying Boyle's motion to sever.

Boyle also contends that the trial court's refusal to sever the cases deprived him of his right to a fair trial. However, apart from arguing that it was unfair for the trial court to conduct a joint trial because the evidence pertaining to the offense against Ashley was weaker than the evidence pertaining to the offenses against Rachel, Boyle fails to make any argument in support of this claim. For the reasons discussed above, evidence pertaining to the offenses against Rachel would have been admissible in a separate trial of the offense against Ashley, notwithstanding the differences in the evidentiary strength of the two cases. Thus, Boyle has failed to demonstrate that the trial court's refusal to sever the cases deprived him of his right to a fair trial.

37

## IV.

## DISPOSITION

The judgment is affirmed.

_____

AARON, J.

WE CONCUR:


_____

HUFFMAN, Acting P. J.


_____

NARES, J.